Filed 6/30/22  In re E.C. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re E.C., a Person Coming Under the Juvenile Court Law. | H049604 (Santa Clara County Super. Ct. No. 19JD026105) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. E.C., Defendant and Appellant. | |

The minor E.C. was 13 months old when he was removed from his parents' custody and placed with his paternal grandparents.[1]  Adjudged a dependent of the court, he was 24 months old by the time the juvenile court terminated reunification services to his incarcerated father, and 34 months old when the juvenile court terminated reunification services to his mother.  At a hearing under Welfare and Institutions Code

---

[1] Because the minor and his father share the same initials and the record identifies the mother variously as S.P. and S.C., we refer to E.C.'s parents as father and mother, rather than by their initials.

section 366.26,[2] the juvenile court terminated parental rights and ordered adoption as E.C.'s permanent plan. The father contends that the court erred in finding he had not established a beneficial relationship with E.C. sufficient to avoid termination of parental rights under section 366.26, subdivision (c)(1)(B)(i). Because the court's analysis conformed to the California Supreme Court's guidance in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) and was supported by substantial evidence, we affirm.

## I. BACKGROUND

On October 21, 2019, a judge of the family court issued an emergency order for the Santa Clara County Department of Family and Children's Services (the Department) to take E.C. into protective custody. The Department filed a juvenile dependency petition two days later, and the juvenile court ordered E.C.'s continued detention. On November 4, 2019, the Department placed E.C. in the care of his paternal grandparents. E.C. has remained with his paternal grandparents ever since.

The Department filed the operative amended juvenile dependency petition in November 2019, under section 300, subdivisions (b)(1), (c), and (j). The Department alleged that E.C.'s father had repeatedly perpetrated domestic violence of a high lethality risk against the mother, exposing E.C. to that violence, and that the father had a long history of active substance abuse that impaired his judgment and placed the minor at a substantial risk of harm while in his care. The Department alleged that E.C.'s mother had been unable or unwilling to take steps to protect the minor from his father's violence and had herself engaged in reactive domestic violence.

Later that month, the juvenile court conducted a combined jurisdiction and disposition hearing. The court found true all allegations of the amended petition, adjudged the minor a dependent of the court, and ordered reunification services for the

---

[2] Undesignated statutory references are to the Welfare and Institutions Code.

2

parents.  The father was not present at the hearing, having declined transport from local law enforcement custody.

During the father's confinement, he did not see E.C. in person but maintained telephone contact, going from "regular" calls through February or March 2020 to calls "about once a week" until his release.  At the nominal six-month review hearing in September 2020, when E.C. was two years old, the court terminated father's reunification services.

Upon the father's release in December 2020, the social worker authorized him to visit E.C. for two hours once a week.  The father visited E.C. as authorized, under supervision by E.C.'s paternal grandparents.

In June 2021, the court terminated the mother's reunification services and set a hearing pursuant to section 366.26 to determine the permanent plan for the minor.

The court held the section 366.26 hearing in December 2021.  The social worker was present, and her three reports were admitted into evidence at the Department's request.  It was undisputed that E.C. was adoptable, that the paternal grandparents were committed to adopting him, and that E.C. was bonded to his paternal grandparents.

Both parents opposed termination of parental rights, invoking the beneficial-relationship exception of section 366.26, subdivision (c)(1)(B)(i).  The sole testifying witnesses were the parents, each of whom described their positive experience of supervised visits with E.C.  The father also described his role as a "stay-at-home dad" during E.C.'s first year.  The Department's counsel acknowledged that the parents' love for E.C. "is certainly very, very clear from [the father's] testimony" but disputed application of the beneficial-relationship exception, as did minor's counsel.  Both the Department and minor's counsel argued, based on the social worker's reports, that E.C.'s attachment to each his parents was limited to one of playmates, rather than a substantial emotional attachment.

3

Two days later, the court ordered adoption as the permanent plan and terminated parental rights.

The father timely appealed.

## II. DISCUSSION

### A. *Legal Principles and Standard of Review*

California's social services and statutory procedures are intended "to strike a delicate balance between protecting children from abuse or neglect and ensuring the continuity of children's emotionally important relationships, especially with their parents. The resulting balance sometimes gives a struggling parent enough time and support to overcome deficiencies and regain custody. When such success is not achieved, the dependency statutes require the court to hold a hearing under . . . section 366.26." (*Caden C.*, *supra*, 11 Cal.5th at p. 625, fn. omitted.) The goal at a section 366.26 hearing is to select and implement a permanent plan for the child. (*Id.* at p. 630.)

The inquiry at the section 366.26 hearing "is decidedly not whether the parent may resume custody of the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 630.) By this stage, reunification services for the parents have already been terminated, "and the assumption is that the problems that led to the court taking jurisdiction have not been resolved." (*Ibid.*) The statutory preference is for adoption: if the court finds by clear and convincing evidence that the child is likely to be adopted, then the court shall terminate parental rights to allow for adoption. (*Ibid.*; § 366.26, subd. (c)(1).) If, however, a parent shows that termination would be detrimental to the child for at least one of the "compelling reason[s]" enumerated by statute, then the court should decline to terminate parental rights and select a different permanent plan. (*Id.* at pp. 630-631; § 366.26, subds. (c)(1)(B) and (c)(4).)

One such compelling reason is the existence of a beneficial relationship (§ 366.26, subd. (c)(1)(B)(i)), where the parent shows, by a preponderance of the evidence: "(1) regular visitation and contact, and (2) a relationship, the continuation of which

4

would benefit the child such that (3) termination of parental rights would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 631, italics omitted.) The focus of the exception is the child, "not a contest of who would be the better custodial caregiver." (*Id*. at p. 634.) In assessing benefit under the second element, the court determines whether the child has a "substantial, positive, emotional attachment to the parent—the kind of attachment implying that [the minor] would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636; *In re A.L.* (2022) 73 Cal.App.5th 1131, 1153 (*A.L.*); *In re Eli B.* (2022) 73 Cal.App.5th 1061, 1068; *In re J.D.* (2021) 70 Cal.App.5th 833, 854 (*J.D.*); see also *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 211 (*L.A.-O.*); *In re D.M.* (2021) 71 Cal.App.5th 261, 270 (*D.M.*).) In evaluating detriment under the third element, the "question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)

We review the juvenile court's findings on the first two elements, and any factual determinations in support of its finding on the third, for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) Where the first two elements are met, the court's ultimate determination on the third element calls for a "delicate balancing" in "assessing the likely course of a future situation that's inherently uncertain" "by weighing the harm of losing the [parental] relationship against the benefits of placement in a[n] . . . adoptive home." (*Id*. at p. 640.) This ultimate decision we review for abuse of discretion. (*Ibid*.)

## B.     *The Juvenile Court's Findings*

In announcing its decision, the juvenile court began by observing that both parents "really love [E.C.]" The court proceeded to address each statutory requirement in turn. As a threshold matter, it found by clear and convincing evidence that E.C. was adoptable—"young and healthy, sweet and active, and . . . he has caregivers, the paternal grandparents, who want to adopt him."

5

On the first element of the beneficial-relationship exception, the court rejected the Department's contention that the absence of visitation during father's 13-month incarceration foreclosed a finding of regular and consistent visitation. "[G]iven that the father did maintain regular [telephonic] contact during his incarceration and has been regular in his visitation since his release, I find that father did meet this prong."

The court, however, found that that father failed to meet the second element of the beneficial-relationship exception. Although the court acknowledged the existence of a relationship between the father and E.C. that was "positive" in that it consisted of "playing for a couple hours a week," the court found that this did not amount to a "substantial positive emotional attachment." "[E.C.'s] only three. . . . [H]e's lived solely in the grandparents' care since the age of one." "There was no testimony to suggest that the father cares for any of [E.C.'s] day-to-day needs. There's no evidence that he feeds him, puts him to bed, bathes him, except for the one time that he mentioned helping him out with the bath, or taking him to medical appointments or other things like that. The extent of their relationship is playing for a couple hours a week." "Where the father did not physically see the child for a third of his life and has not lived with him for two-thirds of his life, and the child is only three, and he's had only a few hours per week with him for the last year, time spent primarily playing, it cannot be said that the child has a positive substantial emotional attachment to the father."

In the alternative, the court also addressed the third element, finding the balance to favor adoption over retention of parental rights, even if the father had established the second element. "I do not believe that the evidence shows it would be detrimental to terminate the relationship with the father, particularly when balanced against the benefits of the adoption. [E.C.] transitions easily back to the care of the grandparents after visiting with Father. The reports indicate that [E.C.] does [not] ask for the father when he's not there, and there was no evidence to suggest that [E.C.] would be detrimentally harmed by terminating the relationship beyond the normal difficulty any child would

6

have in knowing that his parents were not able to care for him." In contrast, "[t]he benefits of adoption in this case are great. [E.C.] is very bonded to his grandparents, and the father has even acknowledged this. The reports indicate that [E.C.] sees them as his psychological parents and looks to them for his daily needs, and he would be in a stable and permanent home with them. Father has even previously indicated to the social worker that he wanted [E.C.] to stay with his parents. I believe that it would be in [E.C.'s] best interest for him to be adopted by the paternal grandparents." The court therefore concluded that the father had not shown the beneficial-relationship exception to apply.

## C.     *Analysis*

On appeal, the father asserts (1) the court committed legal error by considering whether he functioned as a parent to E.C.; and (2) the court lacked substantial evidence to support its finding that E.C. did not meaningfully benefit from the parental relationship. We conclude that the court's resolution of the second element relied on a proper application of *Caden C.* and was supported by substantial evidence.

### 1.     *Legal Error*

Under *Caden C.*, the beneficial-relationship exception does not turn on the parent's fitness as a custodial caregiver, but on the net loss to the child represented by termination of parental rights—"whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) Accordingly, appellate courts since *Caden C.* have been on guard for indications that the juvenile court relied on the parent's failure to reunify and the struggles that led to the dependency, without limiting these considerations to their actual impact on the present relationship with the child. (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1228 (*B.D.*); *D.M.*, *supra*, 71 Cal.App.5th at pp. 269-270.) Similarly problematic are juvenile court comparisons of " 'the parent's attributes as a custodial caregiver relative to those of any potential adoptive parent(s).' " (*J.D.*, *supra*,

7

70 Cal.App.5th at p. 859; see also *L.A.-O.*, *supra*, 73 Cal.App.5th at p. 210; *In re D.P.* (2022) 76 Cal.App.5th 153.).) In particular, appellate courts have expressed concern that a juvenile court's focus on whether the parent occupies a "parental role" may indicate that improper considerations—such as the parent's ability to take custody—were at play. (See *L.A.-O.*, *supra*, 73 Cal.App.5th at pp. 211-212; *D.M.*, *supra*, 71 Cal.App.5th at pp. 270-271; *B.D.*, *supra*, 66 Cal.App.5th at p. 1230.)

The juvenile court here had the benefit of the high court's decision in *Caden C.* and properly focused its analysis on whether E.C. had a "substantial positive emotional attachment" to father. The father's assertion that the court improperly considered whether E.C. viewed father as a "parent" or "psychological parent" misreads the court's analysis.

The juvenile court identified the following facts as relevant to the second element: (1) E.C. has an attachment to his father, whom he recognizes as "Papa" and is excited to play with; (2) their visits, for two hours per week, consist almost exclusively of play, and other than one bath, do not involve attention to E.C.'s basic needs; (3) in E.C.'s first year, father had been a primary caregiver, albeit with assistance from the paternal grandparents; and (4) E.C., who was three at the time of the hearing, had lived solely with his grandparents since he was one and had experienced a 13-month gap during which he was unable to see his father at all.

Each of the factors identified by the juvenile court in evaluating E.C.'s parental attachment is indisputably relevant to an assessment of whether a child would benefit from continuing the relationship. Courts may appropriately consider (1) how children feel about, interact with, look to, or talk about their parents; (2) the age of the child; (3) the portion of the child's life spent in the parent's custody; (4) the positive or negative effect of interaction between parent and child; and (5) the parent's past provision of

8

comfort and care. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632; *B.D.*, *supra*, 66 Cal.App.5th at p. 1230.)[3]

We recognize that a discussion of the past provision of comfort and care must be properly cabined: the question for the purposes of the second element is not the parent's objectively measured fitness as a custodial caregiver or whether the parent can care for the child's needs going forward. (See *Caden C.*, *supra*, 11 Cal.5th at p. 630, 634; *L.A.-O.*, 73 Cal.App.5th at p. 210.) Even so, the past provision of care is relevant, as one factor, in assessing whether the child has a substantial positive *emotional* attachment to the parent. (See *B.D.*, *supra*, 66 Cal.App.5th at p. 1230 [a significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection, and stimulation].) The juvenile court's discussion of the father's provision of care falls within permissible bounds, as the reference was expressly in connection to the existence of a substantial positive emotional attachment.

Conversely, nothing in the record reflects that the juvenile court required the father to establish that E.C. considered him a "parent" or "psychological parent" to meet the second element. The court did not evaluate the quality of E.C.'s attachment based on a failure by his father to perform parenting duties that the removal order foreclosed, but on the appropriate factors described above. It was only in alternatively addressing the third element—the delicate balancing of the anticipated loss of the natural-parent connection against the stability of the adoptive placement—that the court noted reports that E.C. saw his *prospective adoptive parents* as his "psychological parents." This

---

[3] Father cites *In re E.T.* (2018) 31 Cal.App.5th 68 (*E.T.*) for the proposition that "the length of time with caretakers versus a parent may not make a difference and is not determinative of whether the exception to adoption applies." There, the fact that the child had spent slightly more time with the godparents was not in that case "so significant . . . that it would be determinative in favor of termination." (*E.T.*, *supra*, 31 Cal.App.5th at p. 77.) But under *Caden C.*, "the portion of a child's life spent in the parent's custody" is among the relevant factors, whether or not the child may have spent a longer time in the custody of another caregiver. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632.)

9

consideration was not only permissible under *Caden C.*, but necessary to a proper assessment of whether any detriment from the loss of the parental relationship was outweighed by the stability offered by adoption.

The father suggests that even though the juvenile court's express findings were appropriate, those findings may have been influenced by erroneous framing of the legal requirements in the social worker's reports. It is true that the social worker's reports appear to presume a parent-focused relational standard at odds with the clear import of *Caden C.* and its focus on the *child's* experience: she judged the attachment insufficient because the father was "not a father figure, who will care and provide for [E.C.] for *all* his basic and emotional needs, and will be there *every minute of his life*." Even if "be[ing] there every minute" of a child's life could be deemed an appropriate standard at some antecedent stage of dependency proceedings, such a judgment would still be immaterial at a section 366.26 hearing that is "decidedly not" about "whether the parent may resume custody of the child." (See generally *Caden C.*, *supra*, 11 Cal.5th at p. 630.) But the social worker is the Department's agent, not the court's. We find nothing in the record reflecting the court's endorsement of this or any similar misapprehension of *Caden C.* in the reports, and the court did not identify any improper considerations as factors in its analysis.[4] To extrapolate from the mere presence in the record of a party's opinion that the court was misled or persuaded by it would invert the appellate presumption of correctness attendant upon the judgment and the appellant's burden to affirmatively demonstrate error. (See *A.L.*, *supra*, 73 Cal.App.5th at p. 1161.) As in

---

[4] The father notes that the juvenile court admitted the social worker's reports in evidence, over the father's objections to, among other things, references to the father's role as a "parental figure" or "psychological parent." The juvenile court admitted the report in full, reasoning that the challenge did not go to admissibility, the social worker was available for cross-examination, and any challenge to the basis for her opinion could be developed through cross-examination. Ultimately, neither parent sought to examine the social worker.

*A.L.*, E.C.'s father "has not demonstrated error, and it will not be presumed here." (*Ibid.*) Accordingly, we reject the contention that the court relied on improper material introduced through the social worker's reports.

### 2. *Substantial Evidence*

In reviewing the juvenile court's factual findings for substantial evidence, " ' "we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] ' "[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether … a reasonable trier of fact could find [that the order is appropriate]." ' [Citation.]" [Citation.]' " (*In re I.J.* (2013) 56 Cal.4th 766, 773 [reviewing jurisdictional order and sufficiency of evidence in support of Department's burden].) Moreover, "[t]he substantial evidence standard of review takes on a unique formulation where . . . 'the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals.' [Citation.]" (*In re S.G.* (2021) 71 Cal.App.5th 654, 671.) "[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*In re. I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

Under section 366.26, subdivision (c)(1)(B)(i), it was the father's burden to establish his entitlement to the beneficial-relationship exception and each element of that

11

exception. (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) In disputing the sufficiency of the evidence as to the court's determination of the second element, he asserts: "The real issue was whether the minor benefitted from visits, and the evidence showed that he did. In any regard, the worker observed only one visit. Father was, obviously, at every single visit and described the circumstances much differently than the worker who observed one."

It is undisputed that the father was loving and affectionate with E.C. and that E.C. enjoyed the weekly two-hour visits. But given the ample authorities construing the beneficial-relationship exception, we must reject the father's dilute interpretation of the requisite "substantial, positive, emotional attachment to the parent." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) We likewise must decline his oblique invitation to reweigh the evidence and the credibility of the witnesses. Even "[u]ncontradicted testimony rejected by the trial court ' "cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved." ' [Citation.]" (*Id*. at p. 640.)

As it relates to the father, the principal components of the record at the section 366.26 hearing were the social worker's reports and the father's live testimony. As E.C. was only three years old, the parties relied on evidence of E.C.'s observable behaviors.

The social worker acknowledged a continuous relationship between the father and E.C.—the father was a consistent figure in E.C.'s life, serving as one of his primary caregivers until E.C.'s detention, maintaining telephone contact during 13 months of confinement, and maintaining weekly visits after incarceration. But the development of a bond was inhibited by exposure "to drugs and domestic disputes" "in the short time he lived with them[.]" The relationship was further impaired by the father's ensuing confinement for E.C.'s second year of life and by the limited schedule of weekly two-hour visits after father's release from custody.

12

The social worker described E.C. as truly enjoying his father's time and attention. But the social worker also described the visits consistent with mere play. A parent whom the child views as a "mere friend or playmate" falls outside of the beneficial-relationship exception. (*B.D.*, *supra*, 66 Cal.App.5th at p. 1230; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 577; *In re J.C.* (2014) 226 Cal.App.4th 503, 529-530, 533-534.)

The social worker reported that E.C. did not indicate any distress at the end of his visits with father and transitioned easily back to the care of his paternal grandparents. Similarly, E.C. did not ask after his father or exhibit distress when his father missed scheduled visits. E.C. reciprocated but did not initiate affection with his father. As relevant context, the social worker reported that E.C. was capable of manifesting stronger attachment to playmates. For example, the social worker reported that E.C. exhibited a "strong bond" with a ten-year-old male cousin by following him, asking about him, and demonstrating that he did "not like separating from" his cousin. The social worker likewise noted that E.C. "gets upset if he is separated" from his paternal grandparents.

We do not suggest that a child may have a substantial positive emotional attachment with only one person or that the proper test is to compare the strength of his bond with father against the strength of his bond with other relatives or friends. Rather, we view the record as reflecting differences in E.C.'s outward behavior that the court could reasonably have construed as a proxy for the very young child's differing degrees of attachment.

The father's testimony differed slightly from the social worker's report as to his post-release visitation. Able to recognize the father's whistle, E.C. would run to open the front door and initiate affectionate contact; E.C. would reach for his father's hand during visits to initiate activities; and he once looked first to his father for comfort when he hurt himself playing on his scooter during a visit while the social worker and paternal grandparents were nearby in the backyard. The father also described supervising E.C.'s active play and consistently encouraging him whenever he fell or stumbled. In the

father's opinion, E.C. looked sad on learning they were reaching the end of a visit. On one occasion, E.C. insisted on having his father help him out of his bath and said "Papa, you're my hero," and "[Y]ou got me," when the father complied.

We assume without deciding that the father's testimony, to the extent it added to or materially differed from the social worker's reports, could have supplied substantial evidence in support of a finding in his favor, and we observe that the father's own emotional attachment to E.C. is apparent even on a cold transcript. But it is the father's "onerous" burden "to show on appeal that there is *no* substantial evidence to support [the court's determination], and not merely that substantial evidence would have supported a verdict in [his] favor. [Citations.]" (*Flores v. Liu* (2021) 60 Cal.App.5th 278, 297.) And to the extent his testimony differed from the social worker's report, our deferential standard of review constrains us to presume the juvenile court resolved any material factual dispute by crediting the social worker's account instead.

Because the court's resolution of the second element applied the correct legal standards and was supported by substantial evidence, we need not reach the father's further contentions as to the court's resolution of the exception's third element.

### III.    DISPOSITION

We affirm the juvenile court's order terminating the father's parental rights and ordering adoption as the permanent plan.

_____

LIE, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

GROVER, J.

*In re E.C.; DFCS v. E.C.*
H049604